Filed 7/14/23  Govrin v. City of Santa Monica CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| YOSSI GOVRIN et al., | B316310 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 20STCV43902) |
| v. | |
| CITY OF SANTA MONICA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed.

Ahrony Appeals Law Group and Orly Ahrony for Plaintiffs and Appellants.

Douglas Sloan, City Attorney and Catherine M. Kelly, Deputy City Attorney; Berry Silberberg Stokes and Carol M. Silberberg for Defendants and Respondents.

—————————————

Plaintiffs Yossi Govrin, Santa Monica Arts Studio (SMAS), and Maxima (hereafter collectively plaintiffs) appeal from a judgment entered in favor of defendants City of Santa Monica (City), Kevin McKeown, and Shannon Daut (hereafter collectively defendants). The trial court entered judgment in favor of defendants and dismissed the action after it sustained their demurrer to plaintiffs' first amended complaint without leave to amend and granted defendants' special motion to strike plaintiffs' cause of action for defamation pursuant to the anti-SLAPP statute,[1] Code of Civil Procedure section 425.16.

We conclude that the trial court properly sustained the demurrer because plaintiffs failed to allege that they presented a timely claim as required by the Government Claims Act (Gov. Code, § 810 et seq.[2]) or sufficient grounds for excusing that requirement. Additionally, we conclude that plaintiffs have failed to demonstrate how these defects can be cured by a further amendment.

We further conclude that the trial court properly granted defendants' anti-SLAPP motion to strike plaintiffs' defamation cause of action. Defendants showed that the defamation cause of action arose from statements made in connection with a public issue, and plaintiffs failed to establish the cause of action has minimal merit.

---

[1] "SLAPP" is an acronym for "so-called strategic lawsuits against public participation." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139.)

[2] All subsequent undesignated statutory references are to the Government Code.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. SMAS's operation of the airport art studios

For purposes of plaintiffs' appeal from the portion of the judgment sustaining defendants' demurrer, we assume the truth of the following allegations from plaintiffs' first amended complaint. (See *Phillips v. Desert Hospital District* (1989) 49 Cal.3d 699, 702 (*Phillips*).)

In 2001, the City issued a request for proposals (RFP) to create a business in a vacant hangar at the Santa Monica Airport (airport). SMAS, an organization Govrin created to assist artists exhibit and sell their work, submitted a proposal to create art studios in the airport hangar. The City initially selected SMAS's proposal. But defendant McKeown, a then-City Council member who was affiliated with 18th Street Art Center, another bidder, recommended to the City Council that it cancel the RFP because only three organizations submitted proposals. The City Council then cancelled the RFP.

The City issued a second RFP for the airport hangar in 2002. Although McKeown attempted to have the contract awarded to 18th Street Art Center, the City awarded the contract to SMAS. Govrin thereafter leased the 22,500-square-foot hangar from the City. In turn, Govrin subleased space in the hangar to local artists.

SMAS did not receive City funds or subsidies to operate the hangar. Govrin used $1.7 million of his own money to renovate the hangar and create 29 individual art studios and three galleries. Govrin never sought reimbursement from the City for those expenses.

SMAS brought visitors from other cities and countries to exhibitions and programs at the airport art studios. Govrin also

3

assisted artists with career planning, exhibition preparation, and various special events. Additionally, Govrin hosted over 600 fundraisers and events for the local community.

## II. SMAS loses bid to continue operating the airport art studios

In 2017, the City signed an agreement with the Federal Aviation Administration requiring the City to eliminate airport subleases and to charge non-aviation airport tenants rent at market rates. In August 2017, the City notified Govrin that the airport hangar lease would be on a month-to-month basis pending new lease negotiations.

The City further informed Govrin that it would be taking over all leases at the hangar and that the City would issue a RFP for a new manager of the airport art studios. Prior to issuance of the RFP, the City requested that Govrin provide it with information about SMAS's programs and operations. Although Govrin objected that the City was attempting to collect his trade secrets and take over his business, City representatives assured him otherwise. A consultant hired by the City thereafter interviewed Govrin and artists at the airport art studios about SMAS's operations and programs.

Once the City issued the RFP, Govrin, under the name Maxima Art Initiative (Maxima), and several other organizations submitted proposals to manage the airport art studios. According to the complaint, however, then-Mayor and City Council member McKeown, with the aid of defendant Daut, the City's Cultural Affairs Director, manipulated the RFP process to favor McKeown's chosen contractor, 18th Street Art Center.

For example, Daut set up a meeting with five panelists to evaluate bid proposals. All five panelists had personal and

4

professional relationships with 18th Street Art Center. During the meeting with panelists on October 26, 2018, Daut told the panelists that SMAS "had no money," that 18th Street Art Center was a " 'powerful organization,' " and that Govrin " 'wanted a large salary.' " The panelists scored Govrin's proposal below average.

On November 13, 2018, Govrin sent a letter to the City Council and City Attorney protesting the existence of a conflict of interest in the bid process.[3] According to the first amended complaint, Govrin's letter "accused the City of abuse of power by two City officials and the city's staging of the selection process to ensure that it could take over management of the space with a bidder personally selected by Mr. McKeown," i.e., 18th Street Art Center. The City responded and denied the existence of a conflict of interest. Govrin's letter was not attached as an exhibit to the first amended complaint.

The Santa Monica Arts Commission (Commission), a panel appointed by the City Council to provide direction regarding cultural affairs, held a meeting on November 19, 2018, to interview finalists for the airport art studios contract. The Commission voted in favor of a motion to award the contract to Maxima.

The next day, the City informed the Commission that it was rejecting the Commission's motion to award the contract to Maxima. One of the commissioners later informed Govrin that

---

[3] Although the first amended complaint alleges the letter was sent to the City Council and City Attorney, the letter, included as an exhibit with plaintiffs' motion to augment the record, is addressed to the City's Director of Finance.

"there was a deliberate attempt by Shannon Daut and the City of Santa Monica to 'cause [Govrin's] initiative to fail.' "

On December 18, 2018, the City Council held a meeting and voted six to one to award the airport art studios contract to 18th Street Art Center. Daut included 18th Street Art Center's proposal on the City Council's approval agenda, but not Maxima's proposal.

The RFP for the airport art studios contract included the following statement: " 'By submitting a response to this RFP, prospective consultants waive the right to protest after award or seek any legal remedies whatsoever regarding any aspect of this RFP.' " Citing this provision, the first amended complaint alleged that "[t]he RFP documents prohibited Mr. Govrin from filing a protest of the award made to 18th Street [Art Center]," and that by "simply participating in the RFP process, [Govrin] was required to relinquish his right to protest the contract award and abandon any right of action in court." The first amended complaint further alleged that "Govrin rightfully concluded that he would not have an opportunity to challenge the city's decision in court or by filing an administrative claim with the city," and that "Govrin therefore did not file a claim with the city within the statutory 6 months' time . . . ."

Even so, according to the first amended complaint Govrin later "filed a claim after he retained counsel and as soon as he was disabused of the belief that he could not file a claim or challenge the city's decision. The City summarily denied his claim." According to a request for judicial notice filed in the trial court by the City, Govrin's counsel submitted a claim to the City on May 31, 2020. The claim is not in the record and it is thus unclear if it was presented on behalf of all plaintiffs or just

6

Govrin.  On July 7, 2020, the City denied the claim because it was not submitted to the City within six months of the accrual of the causes of action described in the claim.

## III.  Trial court proceedings

### A.  The complaint and first amended complaint

Plaintiffs filed a verified complaint against the City and McKeown on November 17, 2020.  They filed a verified first amended complaint on April 21, 2021, and added Daut as a defendant.

The first amended complaint alleged causes of action for theft of trade secrets and breach of contract implied in fact, negligence, defamation, intentional interference with prospective economic advantage, conversion, fraud and deceit, and violation of the Public Records Act, Government Code section 7921.000 et seq., and sought damages, restitution, attorney fees, and costs. All causes of action were brought on behalf of all plaintiffs against all defendants.  Plaintiffs later dismissed their causes of action for conversion and violation of the Public Records Act.

Plaintiffs' cause of action for theft of trade secrets alleged that during the RFP process, the City collected information about SMAS's operations and programs and then turned the information over to 18th Street Art Center.  As a result of the City's appropriation of plaintiffs' trade secrets, 18th Street Art Center was now working with the same artists Govrin had selected, running the same programs Govrin had developed, and working in the same building Govrin had designed and built.

The cause of action for negligence alleged that defendants breached their duty of care by engaging in "illegal RFP procedures, including (1) allowing the winning bidder to appoint

7

the selection panelists; (2) disregarding the role of the city arts commission; and (3) removing the city council's consideration of the finalist bidders."

The cause of action for defamation alleged that Daut engaged in defamation by making the following statements to Commission members, selection panelists, and persons in the City arts community and the press: "(1) Mr. Govrin's organization is weak and does not have funding while 18th Street [Art Center] is strong financially, has strong management, and provides outstanding programs; (2) Informing Mr. Govrin in front of the selection panelists: 'no more money will be given to you,' suggesting that the city had given him money (which it did not), and placing Mr. Govrin in a bad light in front of the RFP decision-makers. Ms. Daut and Mr. McKeown repeated this information to the press and in emails and private meetings with private individuals in the arts community." According to the complaint, Daut made the alleged statements "to prevent Maxima from winning the RFP and Govrin continuing in his role as manager." Last, the first amended complaint alleged that McKeown "falsely claimed to the press that city officials subsidized SMAS' rent by $4 to $6 Million. He also asked the city to audit SMAS. Fortunately, the audit completely cleared Mr. Govrin and SMAS." The first amended complaint does not identify the date of either Daut's or McKeown's alleged statements.

Plaintiffs' cause of action for intentional interference with prospective economic advantage alleged that the "RFP process the city adopted was a complete sham, conceived to enable the city to place a 'friend' of the current Mayor as manager of the airport facility." Defendants engaged in wrongful conduct in

8

pursuit of their aim, including allowing persons with conflicts of interest to serve on the selection panel; defaming Govrin and SMAS; displacing the Commission from its "usual role" of making recommendations to the City Council; and appropriating Govrin's trade secrets.

Finally, plaintiffs' fraud cause of action alleged that defendants made misrepresentations to Govrin and others regarding SMAS's ability to continue managing the airport art studios, the RFP process, and SMAS's fitness to manage the airport art studios. Defendants also allegedly concealed facts from plaintiffs, such as 18th Street Art Center's personal and professional relationships with selection panelists, McKeown, and Daut; the City's intention to award the airport art studios contract to 18th Street Art Center; and the City's intention to turn over plaintiffs' trade secrets to the winning bidder.

### B.    Motion to strike and demurrer

Defendants filed a special motion to strike the defamation cause of action pursuant to the anti-SLAPP statute and a demurrer to the first amended complaint.

Defendants' special motion to strike contended that McKeown's and Daut's alleged defamatory statements regarding the City's award of the airport art studios contract and the financial condition of SMAS concerned public issues. Their motion emphasized that operation of the airport and preserving the airport's artist community were matters regularly debated by the City Council, the City community, and the local press. Defendants further argued that plaintiffs could not prevail on their defamation cause of action because, among other things, it was barred by the applicable one-year statute of limitations.

9

Defendants' demurrer raised several arguments, including that plaintiffs failed to present a timely claim as required by the Government Claims Act. Defendants also argued that the RFP language cited by plaintiffs did not estop defendants from arguing that plaintiffs failed to present a timely claim.

Plaintiffs opposed both the anti-SLAPP motion and the demurrer. In opposition to the anti-SLAPP motion, plaintiffs argued that while defendants' statements "related to an issue of a public interest nature (a city contract)," the statements "veered far beyond being an issue of interest to the public into purely defamatory language against plaintiffs." Concerning the merits of their cause of action, plaintiffs did not directly address defendants' statute of limitations argument. They argued, among other things, that they were excused from the claim filing requirements of the Government Claims Act and that defendants were estopped from raising the issue. That was so, according to plaintiffs, because the RFP misled Govrin into believing he had no right to pursue legal action against the City regarding the award of the airport art studios contract.

Plaintiffs raised several arguments in opposition to the demurrer, including that the City was equitably estopped from raising the timeliness of a claim under the Government Claims Act due to the purportedly misleading RFP provision.

## C. Trial court order

The trial court granted defendants' anti-SLAPP motion and sustained their demurrer without leave to amend.

Regarding the anti-SLAPP motion, the court concluded that the alleged defamatory statements concerned the award of a city contract, which was an issue of public interest. It further concluded that plaintiffs could not demonstrate a probability of

10

prevailing on the cause of action because they failed to file their complaint within the applicable one-year statute of limitations.

The court sustained defendants' demurrer on the ground that plaintiffs failed to present a claim within six months of the accrual of their causes of action, as required by the Government Claims Act. The court found that the latest plaintiffs' causes of action accrued was December 18, 2018, when the City awarded the airport art studios contract, and that plaintiffs therefore had until June 2019 to present their claim. The May 31, 2020 claim was therefore untimely.

The court also rejected plaintiffs' argument that their failure to present a timely claim was excused by the RFP. The court concluded that the disputed RFP provision constituted a waiver only to challenges to "the form/document itself," but not the City's final award of the contract. The court also rejected plaintiffs' equitable estoppel argument. It noted that no City official told Govrin he could not pursue legal action, and that it was only his interpretation of the RFP that led him to that conclusion. The court also emphasized that it was unreasonable for Govrin not to consult counsel or request clarification from the City itself regarding the scope of the waiver.

The court thereafter dismissed the action in its entirety and entered judgment in favor of defendants. Plaintiffs timely appealed.[4]

---

[4] The notice of appeal identifies only Govrin as an appellant; it does not identify either SMAS or Maxima. Defendants have not raised any issue regarding the omission of SMAS or Maxima from the notice of appeal. Because defendants do not appear to have been misled or prejudiced by the omission, we construe the notice of appeal as including SMAS and Maxima and treat both

11

## DISCUSSION

Plaintiffs raise two challenges to the trial court's order sustaining defendants' demurrer. They first contend the trial court erred by failing to treat Govrin's November 13, 2018 bid protest as a "claim as presented" pursuant to the Government Claims Act. They next argue that even if they failed to present a timely claim under the Government Claims Act, that failure should be excused based on the doctrines of equitable estoppel and equitable tolling.

Plaintiffs also raise two challenges to the trial court's order granting defendants' anti-SLAPP motion. They contend the trial court erred in finding that defendants' statements were in furtherance of the right to free speech in connection with a public issue or issue of public interest. They further argue the trial court erred by finding the defamation cause of action was time-barred.

---

parties as appellants along with Govrin. (See *K.J. v. Los Angeles Unified School Dist.* (2020) 8 Cal.5th 875, 885 [reviewing court should treat notice of appeal as including omitted party where it is "reasonably clear that the [omitted party] intended to join in the appeal, and the respondent was not misled or prejudiced by the omission."].)

Additionally, the notice of appeal states the appeal is from an August 25, 2021 judgment of dismissal after the court sustained a demurrer. But the trial court did not enter that judgment until September 17, 2021. We thus construe the notice of appeal as an appeal from the September 17, 2021 judgment. We also construe the notice of appeal as challenging the court's anti-SLAPP ruling.

12

## I.    Demurrer appeal

### A.    Standard of review

"A demurrer tests the legal sufficiency of the factual allegations in a complaint.  We independently review the sustaining of a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense.  [Citation.]  We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken.  [Citation.]  We construe the pleading in a reasonable manner and read the allegations in context.  [Citation.]  We must affirm the judgment if the sustaining of a general demurrer was proper on any of the grounds stated in the demurrer, regardless of the trial court's stated reasons.  [Citation.]

"It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable probability that the defect can be cured by amendment.  [Citation.]  The burden is on the plaintiff to demonstrate how the complaint can be amended to state a valid cause of action.  [Citation.]  The plaintiff can make that showing for the first time on appeal.  [Citation.]" (*Chapman v. Skype, Inc.* (2013) 220 Cal.App.4th 217, 225–226.)

### B.    Motions to augment the record

Before addressing plaintiffs' contentions regarding the trial court's order sustaining the demurrer, we address plaintiffs' two motions to augment the record.

Plaintiffs' first motion to augment primarily seeks to augment the record to include Govrin's November 13, 2018 bid protest and other correspondence, including letters from Govrin

to the City Mayor, City Attorney, and a U.S. Congressperson. Plaintiffs contend Govrin's bid protest is relevant to whether they presented a timely claim under the Government Claims Act. They argue the remaining correspondence is relevant to their equitable tolling argument.

Defendants oppose the motion on various grounds, including that none of the documents at issue was filed or lodged in the trial court, that the motion is untimely, and that the documents at issue are irrelevant. (See Cal. Rules of Court, rule 8.155(a)(1)(A) [authorizing reviewing court to order record augmented to include "[a]ny document filed or lodged in the case in superior court"]; Local Rules of the Court of Appeal Second App. Dist., Rule 2(b) ["Appellant should file requests for augmentation in one motion within 40 days of the filing of the record"].)

Plaintiffs' second motion to augment primarily seeks to augment the record to include additional correspondence between Govrin and others, which plaintiffs contend is relevant to their equitable tolling argument.

Defendants oppose the second motion to augment on the same grounds as before, i.e., that none of the documents at issue was filed or lodged in the trial court, that the motion is untimely, and that the documents at issue are irrelevant.

As a general matter, we agree with defendants. "Augmentation does not function to supplement the record with materials not before the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; see *People v. Brawley* (1969) 1 Cal.3d 277, 294–295 [denying motion to augment record where documents "were not before the trial court"]; Cal. Rules of Court, rule 8.155(a)(1)(A)). Plaintiffs fail to

14

show that any of the documents they seek to include in the record was filed or lodged in the trial court.

Nonetheless, our analysis is tempered by a competing consideration. As described above, plaintiffs are entitled to demonstrate for the first time on appeal how they can amend their complaint to state a valid cause of action. (*Chapman v. Skype, Inc., supra*, 220 Cal.App.4th at p. 226.) Plaintiffs contend Govrin's bid protest, included with their first motion to augment the record, is relevant to whether they complied with the Government Claims Act. They further contend that most of the remaining documents support their equitable tolling argument because the documents purportedly show Govrin actively pursued the claims at issue by "reach[ing] out to city officials and rally[ing] community support" to preserve the claims.

Construing plaintiffs' motions to augment the record and the accompanying exhibits as part of their effort on appeal to show they can amend the first amended complaint to allege compliance with the Government Claims Act, or, in the alternative, that equitable tolling applies here, we thus grant the motions to augment for those limited purposes.

## C.    Government Claims Act

### 1.    General requirements

The Government Claims Act (§ 810 et seq.) "prescribes the manner in which public entities may be sued." (*Chalmers v. County of Los Angeles* (1985) 175 Cal.App.3d 461, 464.)

Section 945.4 provides, in relevant part, that "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefor has been presented to the public

15

entity and has been acted upon by the board, or has been deemed to have been rejected by the board . . . ." Such a written claim must include specific information, including "[t]he date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted," "[a] general description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of presentation of the claim," and "[t]he name or names of the public employee or employees causing the injury, damage, or loss, if known." (§ 910, subds. (c)–(e).) The claim must also be signed by the claimant or someone on his behalf. (§ 910.2.)

"A claim relating to a cause of action . . . for injury to person . . . shall be presented . . . not later than six months after the accrual of the cause of action." (§ 911.2, subd. (a).) A claim accrues on the date it would accrue under the applicable statute of limitations were there no claim presentation requirement. (§ 901.) " '[U]nder these statutes, failure to timely present a claim for money or damages to a public entity bars a plaintiff from filing a lawsuit against that entity.' "[5] (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 738.)

---

[5] A claimant who fails to present a timely claim may file an application to the public entity for leave to present the claim. (§ 911.4, subd. (a).) Such an application must be presented "within a reasonable time not to exceed one year after the accrual of the cause of action and shall state the reason for the delay in presenting the claim." (*Id*., subd. (b).) If such an application is denied, "a petition may be made to the court for an order relieving the petitioner from Section 945.4." (§ 946.6.) Plaintiffs do not allege they filed a late-claim application here.

The claim presentation requirements of the Government Claims Act also generally apply to claims against a public employee based on acts or omissions in the scope of employment as a public employee.  (§ 950.2;[6] see *Olson v. Manhattan Beach Unified School Dist.* (2017) 17 Cal.App.5th 1052, 1055, fn. 1 (*Olson*) ["The defense of noncompliance with the Government Claims Act also applies to the claims against [the individual defendant]."]; *Briggs v. Lawrence* (1991) 230 Cal.App.3d 605, 613 [Government Claims Act generally requires "one who sues a public employee on the basis of acts or omissions in the scope of the defendant's employment have filed a claim against the public-entity employer pursuant to the procedure for claims against public entities."].)

"The purpose of the claims statutes is not to prevent surprise, but 'to provide the public entity sufficient information to

---

[6] Section 950.2 provides, in relevant part, as follows:  "Except as provided in Section 950.4, a cause of action against a public employee or former public employee for injury resulting from an act or omission in the scope of his employment as a public employee is barred if an action against the employing public entity for such injury is barred under Part 3 (commencing with Section 900) of this division or under Chapter 2 (commencing with Section 945) of Part 4 of this division."  Plaintiffs do not argue their causes of action against McKeown or Daut are exempt from the claim presentation requirements of the Government Claims Act.  Any such contention has thus been forfeited.  (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555 [" 'Even when our review "is de novo, it is limited to issues which have been adequately raised and supported in [appellant's opening] brief." ' "].)

17

enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation. [Citations.] It is well-settled that claims statutes must be satisfied even in face of the public entity's actual knowledge of the circumstances surrounding the claim.' [Citation.] The claims statutes also 'enable the public entity to engage in fiscal planning for potential liabilities and to avoid similar liabilities in the future.' " (*City of Stockton v. Superior Court, supra*, 42 Cal.4th at p. 738.)

The failure to plead facts demonstrating or excusing compliance with the claim presentation requirements of the Government Claims Act subjects a claim against a public entity to a demurrer for failure to state a cause of action. (*State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1239.)

### 2. Claim as presented

As noted, plaintiffs' first amended complaint conceded that a claim for damages was not presented to the City within six months of the accrual of their causes of action.[7] But plaintiffs contend Govrin's November 13, 2018 bid protest was presented to the City within six months of the accrual of their causes of action and constituted a "claim as presented."[8] They further argue that

---

[7] Although the first amended complaint conceded that "*Govrin* . . . did not file a claim with the city within the statutory 6 months' time" (italics added), all parties assume the concession applies equally to plaintiffs SMAS and Maxima. We therefore assume the same.

[8] Defendants argue that plaintiffs forfeited this argument by failing to raise it in the trial court. Although it is generally the rule that a failure to raise an issue in the trial court results in a forfeiture of that issue on appeal (*In re Dakota H.* (2005) 132

18

because defendants failed to notify them of the deficiencies in the "claim as presented," defendants have waived any defense to its sufficiency. We disagree.

"A 'claim as presented' is a claim that is defective in that it fails to comply substantially with Government Code sections 910 and 910.2, but nonetheless puts the public entity on notice that the claimant is attempting to file a valid claim and that litigation will result if it is not paid or otherwise resolved. A 'claim as presented' triggers a duty on the part of the governmental entity to notify the claimant of the defects or omissions in the claim." (*Alliance Financial v. City and County of San Francisco* (1998) 64 Cal.App.4th 635, 643 (*Alliance Financial*); see § 910.8.[9]) "A failure to notify the claimant of the deficiencies in a 'claim as

---

Cal.App.4th 212, 221), that rule does not apply in the context of an appeal from a trial court's order sustaining a general demurrer. In that circumstance, an appellate court "make[s] a de novo determination of whether the complaint alleges 'facts sufficient to support a cause of action under *any possible legal theory*.' " (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1244.) Thus, "an appellate court 'may consider new theories on appeal from the sustaining of a demurrer.' " (*Id.* at p. 1245.)

[9] Section 910.8 provides, in relevant part, as follows: "If, in the opinion of the board or the person designated by it, a claim as presented fails to comply substantially with the requirements of Sections 910 and 910.2 . . . the board or the person may, at any time within 20 days after the claim is presented, give written notice of its insufficiency, stating with particularity the defects or omissions therein."

19

presented' waives any defense as to its sufficiency." (*Alliance Financial*, at p. 643; see § 911.[10])

"[A] document constitutes a 'claim as presented' . . . if it discloses the existence of a 'claim' which, if not satisfactorily resolved, will result in a lawsuit against the entity. [Citation.] A public entity's receipt of written notice that a claim for monetary damages exists and that litigation may ensue places upon the public entity the responsibility, and gives it the opportunity, to notify the potential plaintiff pursuant to sections 910.8 and 911 of the defects that render the document insufficient under sections 910 and 910.2 and thus might hamper investigation and possible settlement of the claim. Such a written notice claiming monetary damages thereby satisfies the purposes of the claims act—to facilitate investigation of disputes and their settlement without trial if appropriate." (*Phillips*, *supra*, 49 Cal.3d at p. 709.)

Plaintiffs rely on three cases—*Phillips*, *supra*, 49 Cal.3d 699, *Alliance Financial*, *supra*, 64 Cal.App.4th 635, and *Foster v. McFadden* (1973) 30 Cal.App.3d 943 (*Foster*)—in support of their contention that the bid protest was a "claim as presented."

In *Phillips*, the plaintiff underwent unsuccessful surgery at the defendant hospital. (*Phillips*, *supra*, 49 Cal.3d at pp. 702–703.) Counsel for the plaintiff and her husband thereafter wrote to the hospital advising it that they intended "to commence an action" against the hospital arising from medical negligence. (*Id*.

---

[10]   Section 911 provides that, subject to an exception that is inapplicable here, "[a]ny defense as to the sufficiency of the claim based upon a defect or omission in the claim as presented is waived by failure to give notice of insufficiency with respect to the defect or omission as provided in Section 910.8 . . . ."

at p. 703.)  The letter further stated that the plaintiff suffered "subsequent complications, treatment, damages and emotional distress," and that the plaintiff's husband would "claim damages for loss of consortium and for his mental and emotional suffering" based on his wife's injuries.  (*Ibid.*)  Our high court concluded the letter, "which disclose[d] the existence of a claim that if not paid or otherwise resolved [would] result in litigation," triggered the defendant's duty to advise the plaintiff and her husband that their letter failed to satisfy the requirements of the Government Claims Act, i.e., it was a "claim as presented."  (*Id.* at pp. 707–708.)

In *Alliance Financial*, the plaintiff purchased invoices for janitorial services rendered to defendant.  (*Alliance Financial*, *supra*, 64 Cal.App.4th at p. 639.)  The plaintiff's counsel then wrote to the defendant, notified it of the plaintiff's entitlement to payment under the invoices, identified the sums due under the invoices, and asked for information related to the invoices to " 'avoid the necessity of litigation in this matter.' "  (*Ibid.*)  The plaintiff's counsel sent a second letter, reiterating the plaintiff's entitlement to the amounts due under the invoices and offering to meet "prior to filing an action for recovery" of the disputed sums.  (*Id.* at pp. 646–647.)  Relying on *Phillips*, the court held that the letters by the plaintiff's counsel constituted a "claim as presented."  (*Ibid.*)  The court emphasized that the first letter "states the existence of a debt, asserts a right to payment, [and] speaks of avoiding litigation," and that the second letter "informs the [defendant] that the claim is ripe and that litigation can be expected if the matter is not resolved."  (*Ibid.*)

Last, in *Foster*, the plaintiff was struck by a bulldozer operated by the defendant's employee.  (*Foster*, *supra*, 30

21

Cal.App.3d at p. 945.)  The plaintiff's counsel wrote to the defendant's employee, with a copy to the defendant, and advised the employee of the plaintiff's name, the date and place of the accident, and asked the employee to forward the letter to the employee's insurance carrier.  (*Ibid*.)  The letter further advised that if the employee was not insured, the employee should contact the attorney to discuss "what to do about the matter," and closed with the "hope that direct dealing between the parties would avoid the necessity for 'initiating formal proceedings.' " (*Ibid*.)  The court held that the letter "accomplished the two principal purposes of a sufficient claim.  It afforded the [defendant] the opportunity to make a prompt investigation of the accident" and "gave to the [defendant] the opportunity to settle without suit, if it so desired."  (*Id*. at p. 949.)

We find the present case distinguishable from *Phillips*, *Alliance Financial*, and *Foster*.  To be sure, the bid protest objected to the City's decision to subject management of the airport art studios to competitive bidding.  Among other things, Govrin's 22-page letter protested the City's "take over" of his business; that his "business and its concept" were his intellectual property; that his "rights to free enterprise have been infringed upon"; and that the City's decision to allow the airport art studios to continue under different management "without compensating [him] for it . . . is simply morally unethical."  Govrin's letter likewise protested the alleged affiliations between the bid selection panelists and 18th Street Art Center.  Last, the letter objected to the score given Maxima's proposal by the bid selection panelists and requested the City to re-score the proposal with different bid selection panelists.

22

However, despite its claim to a "moral[ ]" entitlement to compensation, we have significant doubts about whether the bid protest—even assuming it was submitted on behalf of all three plaintiffs—adequately indicated that plaintiffs were making a claim against the City for monetary damages.[11] (See *Phillips*, *supra*, 49 Cal.3d at p. 710 [letter constitutes "claim as presented" where "the existence of a claim for monetary damages is definitely disclosed by the document"]; *Green v. State Center Community College District* (1995) 34 Cal.App.4th 1348, 1357 (*Green*) [letter was not "claim as presented" where, among other things, there was nothing in letter from which court could "even infer that a claim was being made"].)

But even assuming it did, unlike the letters in *Phillips*, *Alliance Financial*, and *Foster*, the bid protest failed whatsoever to indicate that plaintiffs intended to bring a lawsuit against defendants in the event the airport art studios contract was

---

[11] In addition to the letter's equivocal claim to monetary damages, we find it notable that Govrin sent the letter *before* the City awarded the airport art studios contract to a competitor. A claim for damages based on the loss of Govrin's business—the basis for most of plaintiffs' subsequent causes of action—would thus have been premature at that stage.

Also, the bid protest fails to mention the alleged statements that are the subject of plaintiffs' cause of action for defamation, let alone indicate that plaintiffs were making a claim for damages based on those statements. In this respect, the letter clearly failed to satisfy the "claim as presented" test. (See *Olson*, *supra*, 17 Cal.App.5th at p. 1062 [union grievance was not "claim as presented" regarding defamation or deceit claims where "nothing in the grievance suggests appellant was asserting or would assert those claims"].)

awarded to a competitor. (See *Olson*, *supra*, 17 Cal.App.5th at p. 1062 [union grievance was not "claim as presented" where "nowhere does the grievance threaten litigation if the contractual breaches are not remedied"]; *Green*, *supra*, 34 Cal.App.4th at p. 1359 [letter was not "claim as presented" where, among other things, "there is nothing in counsel's . . . letter to the [defendant] remotely implying . . . that counsel would initiate litigation if [plaintiff's] demand was not satisfied"].) Far from threatening litigation, the bid protest closed simply with a request that Maxima's proposal be re-scored. The bid protest thus fails to "disclose[ ] the existence of a 'claim' which, if not satisfactorily resolved, *will result in a lawsuit against the entity*." (*Phillips*, *supra*, 49 Cal.3d at p. 709, italics added.)

In sum, we reject plaintiffs' contention that the November 13, 2018 bid protest constituted a "claim as presented," and that the City was thus barred from asserting that the letter was insufficient to satisfy the claim presentation requirements of the Government Claims Act.[12]

## D. Equitable estoppel and equitable tolling

Plaintiffs contend that even if the bid protest did not constitute a "claim as presented," the doctrines of equitable

---

[12] Defendants argue that, in addition to failing to satisfy the "claim as presented" test, plaintiffs fail to show the bid protest satisfies the "substantial compliance" test. (See, e.g., *Olson*, *supra*, 17 Cal.App.5th at pp. 1059–1062 [describing "claim as presented" and "substantial compliance" tests].) We do not address that argument because plaintiffs do not contend that the bid protest satisfied the "substantial compliance" test.

estoppel and equitable tolling apply here and excuse their failure to present a timely claim.[13]  We address each doctrine in turn.

## 1.  Equitable estoppel

Under the heading "Equitable Tolling Principles," plaintiffs cite and quote from cases involving equitable estoppel.  Plaintiffs do not separately argue how the doctrine of equitable estoppel applies here and the issue appears to be subsumed by their discussion of equitable tolling.  As a result, plaintiffs have forfeited their equitable estoppel argument.  (See *Consolidated Irrigation District v. City of Selma* (2012) 204 Cal.App.4th 187, 201 [failure to comply with rule that each argument be presented under a separate heading forfeits the argument]; *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].) Nevertheless, we address the issue in the interest of justice, and because it is intertwined with plaintiffs' equitable tolling argument.

"It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act.  [Citations.]  Estoppel most commonly results from misleading statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential." (*John R. v. Oakland Unified School District* (1989) 48 Cal.3d 438, 445 (*John R.*).)  " 'Estoppel may also be invoked

---

[13]     Defendants contend plaintiffs waived their equitable tolling argument by failing to raise it in the trial court.  We disagree for the reasons explained in footnote 8.

where conduct on behalf of the public entity induces a reasonably prudent person to avoid seeking legal advice or commencing litigation.' " (*J.P. v. Carlsbad Unified School District* (2014) 232 Cal.App.4th 323, 333 (*J.P.*).)

" 'Estoppel as a bar to a public entity's assertion of the defense of noncompliance arises when the plaintiff establishes by a preponderance of the evidence:  (1) the public entity was apprised of the facts, (2) it intended its conduct to be acted upon, (3) plaintiff was ignorant of the true state of facts, and (4) relied upon the conduct to his detriment.' " (*J.P.*, *supra*, 232 Cal.App.4th at p. 333.)  " ' Reliance by the party asserting the estoppel on the conduct of the party to be estopped must have been reasonable under the circumstances.' " (*Santos v. Los Angeles Unified School District* (2017) 17 Cal.App.5th 1065, 1076.)

Plaintiffs' equitable estoppel argument, like their equitable tolling argument, appears to rest on the provision in the City's airport art studios RFP stating as follows:  "By submitting a response to this RFP, prospective consultants waive the right to protest after award or seek any legal remedies whatsoever regarding any aspect of this RFP."  Plaintiffs contend this provision was ambiguous and led Govrin to reasonably believe that by submitting a proposal, he waived his ability (and presumably the ability of SMAS and Maxima) to pursue not only a legal challenge to the RFP, but any legal challenge to the City's later award of the airport art studios contract.  Plaintiffs invoke contract interpretation principles and argue that the alleged ambiguity in the RFP should be construed against the City.

As an initial matter, despite their reliance on contract interpretation principles, plaintiffs do not contend the RFP

26

provision *in fact* barred their lawsuit.  Their reliance on contract interpretation principles is thus unhelpful here.  The core of plaintiffs' argument is instead that Govrin was reasonably misled by the alleged ambiguity in the RFP to believe he could not pursue any legal action against defendants, either on his own behalf or on behalf of SMAS and/or Maxima.[14]

We disagree that this argument supports the application of equitable estoppel here.  Even assuming Govrin relied on the purported ambiguity in the RFP provision in failing to present a timely claim on behalf of himself, SMAS and/or Maxima, we are not convinced such reliance was reasonable under the circumstances.  In rejecting the application of equitable estoppel in *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1317 (*Steinhart*), our high court found it "significant" that, as here, the statements on which the appellant based her estoppel claim "were, at most, ambiguous and confusing . . . ."  *Steinhart* stressed "where a party asserts estoppel, 'the facts proved must be such that an estoppel is clearly deducible from them,' " and that the " 'representation, whether by word or act, to justify a prudent man in acting upon it, must be plain, not doubtful or matter of questionable inference.  *Certainty* is essential to all estoppels.  [Citation].' "  (*Id.* at p. 1318.)

---

[14]    We note that plaintiffs do not address an apparent inconsistency in their argument.  Although they argue that the RFP misled Govrin to believe he could not pursue any type of legal action regarding the airport art studios contract, he apparently filed a complaint with the Fair Political Practices Commission in May 2019 regarding the City's decision to award the contract to 18th Street Art Center.

*Steinhart* thus helps to explain why the equitable estoppel cases plaintiffs cite are distinguishable—none involved ambiguous statements or conduct. For example, both *John R.* and *J.P.* involved defendants that explicitly instructed the injured parties not to discuss their claims with anyone. (See *John R.*, *supra*, 48 Cal.3d at p. 442 [teacher threatened retaliation against student if student reported molestation to anyone]; *J.P.*, *supra*, 232 Cal.App.4th at pp. 327–329 [parents of molested students were repeatedly told by school officials and criminal prosecutor not to discuss their children's allegations with anyone].) The purported ambiguity in the RFP is not equivalent to such statements, which directly discouraged the injured parties from seeking advice about their legal claims. (See *J.P.* at p. 336 [substantial evidence supported jury's finding that children's parents reasonably interpreted statements of school officials "as prohibiting any discussion of the molestation incident with civil lawyers or others who might have counseled them to file a government claim"].)

*Sofranek v. County of Merced* (2007) 146 Cal.App.4th 1238 (*Sofranek*), involved a defendant that sent a response to the plaintiff's claim which specifically misled the plaintiff about the deadline for pursing a lawsuit. (See *id.* at p. 1251 ["[B]y informing Sofranek he had six months from August 2004 to file suit, the County's course of conduct was inconsistent with treating the limitations period as running from the March 2004 rejection notice"].) Unlike in *Sofranek*, defendants did not say anything to plaintiffs, let alone mislead them, about the deadlines for presenting a claim or pursuing a lawsuit.

Finally, *Bertorelli v. City of Tulare* (1986) 180 Cal.App.3d 432 (*Bertorelli*), is also distinguishable. There, soon after the

28

plaintiff's claim accrued he was involved in ongoing settlement discussions with an insurance adjuster for the defendant, who referred in correspondence to the plaintiff's "personal injury claim." (*Id.* at p. 441.) The court concluded that the "continuous settlement negotiations grounded on the public entity's knowledge" of the plaintiff's claim "could induce a reasonably prudent person to rely on the continued state of affairs without seeking counsel. A reasonably prudent person would believe that nothing further need be done to preserve his or her claim." (*Ibid.*) By contrast, plaintiffs do not allege that they were in ongoing settlement negotiations with the defendants regarding their claims. To the contrary, a declaration Govrin submitted in the trial court stated that after the City rejected the bid protest, his subsequent letters to City officials regarding the airport art studios contract went unanswered.

We see no reason to discuss the remaining equitable estoppel cases cited by plaintiffs other than to note that they are plainly inapposite too.[15]

_____

[15] See *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462 [estoppel barred state and city from claiming title to disputed land where they "conducted themselves relative to settled and subdivided lands . . . as if no title problems existed and have misled thousands of homeowners in the process"]; *Citizens for a Responsible Caltrans Decision v. Department of Transportation* (2020) 46 Cal.App.5th 1103, 1131–1132 [disputed factual issue whether state agency made misleading statements regarding timeline and process for issuing environmental impact report, intending statements to be relied upon]; *Kleinecke v. Montecito Water District* (1983) 147 Cal.App.3d 240, 247 [estoppel barred defendant from raising statute of limitations defense where wrong party, represented by defendant's counsel, was served with

We further disagree with plaintiffs' contention that their failure to seek legal advice regarding the claims at issue was reasonable under the circumstances. Plaintiffs emphasize that the bid protest stated that "the proposal process also does not allow [Govrin] to seek counsel or actively engage with other city officials." According to plaintiffs, although this statement revealed Govrin's misunderstanding about the scope of the RFP provision, the City's response to the bid protest failed to advise Govrin about his right to seek counsel.

But the City did not have a duty to advise Govrin to seek counsel or inform him of the claim presentation requirements of the Government Claims Act. (See *Tyus v. City of Los Angeles* (1977) 74 Cal.App.3d 667, 673 [rejecting argument that board of police commissioners and mayor, who received letters from appellant regarding his arrest, had "duty to advise appellant of the claims statutes or to consult an attorney"].) Furthermore, and importantly, even if the RFP was ambiguous regarding plaintiffs' ability to pursue legal action, plaintiffs point to nothing in the RFP suggesting they were barred from consulting legal counsel. (Compare *J.P.*, *supra*, 232 Cal.App.4th at p. 336.) If anything, the purported ambiguity in the RFP should have led Govrin, a layperson with a significant stake in the continued management of the airport art studios, to promptly consult legal counsel regarding the scope and impact of the RFP. We thus agree with the trial court's conclusion that it "was unreasonable for Govrin not to consult counsel or request clarification from the

---

complaint, and counsel filed answer on behalf of wrong party containing a general denial "which served to divert plaintiff's counsel's attention away from the statute of limitations"].

City itself as to the [RFP provision]." (See *Bertorelli, supra,* 180 Cal.App.3d at p. 439 [" 'claimant must at a minimum make a diligent effort to obtain legal counsel . . . after the accrual of the cause of action . . . . The reasonable and prudent course of conduct under the circumstances of this case was to seek legal counsel.' "]; see also *Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1779 ["The claimant must, at a minimum, make a diligent effort to obtain legal counsel within six months after the accrual of the cause of action."].)

In sum, we conclude that plaintiffs' equitable estoppel argument fails as a matter of law. (See *California Cigarette Concessions v. City of Los Angeles* (1960) 53 Cal.2d 865, 868 ["When . . . the facts are undisputed, the existence of an estoppel is a question of law"].)

### 2.    Equitable tolling

"Equitable tolling is a 'judicially created, nonstatutory doctrine' that ' "suspend[s] or extend[s] a statute of limitations as necessary to ensure fundamental practicality and fairness." ' [Citation.]  The doctrine applies 'occasionally and in special situations' to 'soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court.' [Citation.]  Courts draw authority to toll a filing deadline from their inherent equitable powers—not from what the Legislature has declared in any particular statute. [Citation.] For that reason, we presume that statutory deadlines are subject to equitable tolling." (*St. Francis Memorial Hospital v. State Department of Public Health* (2020) 9 Cal.5th 710, 719–720 (*Saint Francis*).)

Equitable tolling derives from three lines of cases.  In one line of cases, "[c]ourts found a basis to offer some flexibility from

31

the statute of limitations when a plaintiff was already involved in one lawsuit, and filed a subsequent case that could lessen the damage or harm that would otherwise have to be remedied through a separate case." (*Saint Francis*, *supra*, 9 Cal.5th at p. 724.) In a second line of cases, "courts toll statutes of limitations in situations where a plaintiff was required to pursue, and did indeed pursue, an administrative remedy before filing a civil action." (*Ibid.*) "In a third line of cases, courts tolled the statute of limitations ' "to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits." ' " (*Ibid.*)

Plaintiffs do not base their equitable tolling argument on their pursuit of a prior lawsuit or administrative remedy. It thus appears their argument rests on the third line of cases. Indeed, "pursuit of an alternate remedy is not always required for equitable tolling. The doctrine is applied flexibly to 'ensure fundamental practicality and fairness.' [Citations.] . . . . 'As with other general equitable principles, application of the equitable tolling doctrine requires a balancing of the injustice to the plaintiff occasioned by the bar of his claim against the effect upon the important public interest or policy expressed by the [Government] Claims Act limitations statute.' " (*J.M. v. Huntington Beach Union School District* (2017) 2 Cal.5th 648, 658 (*J.M.*).)

Notwithstanding the flexible nature of the equitable tolling doctrine, a plaintiff seeking the benefit of equitable tolling must show three elements: (1) timely notice; (2) lack of prejudice to the defendant; and (3) reasonable and good faith conduct on the part of the plaintiff. (*Saint Francis*, *supra*, 9 Cal.5th at p. 724.)

Plaintiffs' equitable tolling argument relies on similar considerations as their equitable estoppel argument. They contend the RFP reasonably misled Govrin regarding plaintiffs' ability to pursue legal action to challenge the City's award of the airport art studios contract. They further argue that the bid protest gave defendants adequate notice of plaintiffs' claims; that because defendants had adequate notice of plaintiffs' claims, defendants were not prejudiced in their ability to defend the claims on the merits; and that plaintiffs acted reasonably and in good faith by submitting the bid protest and thereafter sending letters to various public officials describing objections to the City's decision regarding management of the airport art studios contract.

Our conclusion that plaintiffs fail to allege facts sufficient to warrant equitable tolling, although framed by the specific elements of equitable tolling, substantially mirrors our earlier analysis regarding both plaintiffs' "claim as presented" and equitable estoppel arguments.[16]

"When considering whether a plaintiff provided timely notice, courts focus on whether the party's actions caused the defendant to be 'fully notified within the [statute of limitations] of

---

[16] Defendants contend that equitable tolling does not apply to the six-month deadline for presenting a claim under section 911.2 of the Government Claims Act. (See *Willis v. City of Carlsbad* (2020) 48 Cal.App.5th 1104, 1121 ["We conclude the doctrine of equitable tolling cannot be invoked to suspend section 911.2's six-month deadline for filing a prerequisite government claim."].) We need not reach that argument. Even assuming equitable tolling applies here, we conclude that plaintiffs have failed to satisfy the elements of equitable tolling.

33

plaintiffs' claims and their intent to litigate.' " (*Saint Francis*, *supra*, 9 Cal.5th at p. 726.) This first element of equitable tolling "ought to be interpreted literally: When confronted with equitable tolling claims, courts must examine each case on its facts to determine whether the defendant received timely notice of the plaintiff's intent to file suit." (*Id*. at p. 727.)

As we determined in connection with plaintiffs' "claim as presented" argument, nothing in the bid protest clearly alerted defendants to plaintiffs' intent to litigate their claims. (Compare *Saint Francis*, *supra*, 9 Cal.5th at p. 727 [notice element satisfied where, before expiration of statute of limitations, appellant filed request for reconsideration of disputed decision and notified opposing counsel of intention to file writ of mandate if request for reconsideration was unsuccessful]; see also *Addison v. State of California* (1978) 21 Cal.3d 313, 319 [notice element satisfied where plaintiffs presented Government Claims Act claim and filed federal court lawsuit within applicable deadlines].) Because plaintiffs fail to cite anything else that allegedly "fully notified" defendants within the applicable six-month claim presentation deadline of plaintiffs' intent to litigate their claims (*Saint Francis*, *supra*, 9 Cal.5th at p. 726), we are doubtful plaintiffs have satisfied the first element of equitable tolling.

For much the same reason, we are not convinced plaintiffs have adequately shown a lack of prejudice to defendants. (See *Saint Francis*, *supra*, 9 Cal.5th at p. 728 ["core focus" of prejudice analysis is "whether application of equitable tolling would prevent the defendant from defending a claim on the merits"].) It appears that the earliest plaintiffs made defendants aware of their intent to litigate their claims was May 31, 2020, when plaintiffs presented a late claim nearly a year after the applicable

six-month claim presentation deadline expired.[17]  Defendants thus lost considerable time in which "to gather defense evidence in the event a court action ultimately [was] filed."  (*Addison v. State of California*, *supra*, 21 Cal.3d at p. 318.)

But even assuming plaintiffs could demonstrate notice and lack of prejudice, we conclude that they fail to show the final element of equitable tolling:  reasonable and good faith conduct.  (*Saint Francis*, *supra*, 9 Cal.5th at p. 728.)  To satisfy this element, a "plaintiff's conduct must be objectively reasonable and subjectively in good faith."  (*Id*. at p. 729.)

"An analysis of reasonableness focuses not on a party's intentions or the motives behind a party's actions, but instead on whether that party's actions were fair, proper, and sensible in light of the circumstances."  (*Saint Francis*, *supra*, 9 Cal.5th at p. 729.)  Thus a "party seeking equitable tolling must satisfy a similar standard:  It must demonstrate that its late filing was objectively reasonable under the circumstances."  (*Ibid*.)

Plaintiffs' failure to meet the six-month claim presentation requirement was not objectively reasonable under the circumstances.[18]  As we have already concluded above, faced with a purportedly ambiguous RFP provision that could affect the ability to pursue legal action and the significant stakes involved, it was objectively unreasonable for Govrin, a layperson, not to

---

[17]    As noted already, because the May 2020 claim is not in the record, we cannot determine whether it was presented on behalf of all three plaintiffs or just Govrin.

[18]    Because we find that plaintiffs' conduct was not objectively reasonable, we need not address whether it was also subjectively in good faith.  (See *Saint Francis*, *supra*, 9 Cal.5th at p. 729.)

have quickly sought legal counsel regarding plaintiffs' claims. (See *N.G. v. County of San Diego* (2020) 59 Cal.App.5th 63, 74 ["In most cases, ' "a petitioner may not successfully argue excusable neglect when he or she fails to take *any action* in pursuit of the claim within the six-month period," ' including making an attempt to retain counsel."]; see also *Munoz v. State of California*, *supra*, 33 Cal.App.4th at p. 1779; *Bertorelli*, *supra*, 180 Cal.App.3d at p. 439.) We thus disagree with plaintiffs that it was reasonable under the circumstances for Govrin to instead write letters to public officials including the City Mayor, City Attorney, and a U.S. Congressperson, and to file a complaint with the Fair Political Practices Commission. Even assuming those measures were taken in good faith, such conduct standing alone, given our conclusions above, was not objectively reasonable under the circumstances. That a claim was presented to the City shortly after Govrin hired legal counsel underscores the point.

Unfortunately, plaintiffs' equitable tolling argument amounts mostly to a " 'garden variety claim[ ] of excusable neglect' " (*Saint Francis*, *supra*, 9 Cal.5th at p. 730), brought on primarily by Govrin's unawareness of the requirements of the Government Claims Act and his failure to promptly seek legal counsel who could have advised him about the applicable claim presentation deadline before it was too late. "If oversight of such plain rules justified equitable relief, the structure of the Government Claims Act would be substantially undermined, and its provisions for timely notice to public entities subverted." (*J.M.*, *supra*, 2 Cal.5th at p. 658; see also *St. Francis*, at p. 730 [requiring objective reasonableness and subjective good faith precludes equitable tolling doctrine "from being 'a cure-all for an entirely common state of affairs,' while ensuring that it provides

36

a narrow form of relief in 'unusual circumstances' when justice so requires"].)

We therefore conclude that plaintiffs have not alleged facts sufficient to show that their failure to present a timely claim in accordance with the Government Claims Act was excused by the doctrine of equitable tolling.

### E.     Further amendment

Leave to amend is properly granted where "resolution of the legal issues does not foreclose the possibility that the plaintiff may supply necessary factual allegations." (*City of Stockton v. Superior Court*, *supra*, 42 Cal.4th at p. 747.)  Plaintiffs bear the burden on appeal of showing in what manner they can amend their complaint and how that amendment will change the legal effect of their pleading.  (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 (*Rakestraw*).)  Where plaintiffs offer no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend.  (*Id.* at p. 44.)

For the reasons detailed above, the factual allegations that plaintiffs propose to add to their first amended complaint fail to demonstrate compliance with the Government Claims Act or sufficient equitable grounds for excusing such compliance.  We therefore conclude that the trial court did not abuse its discretion in sustaining defendants' demurrer to the first amended complaint without leave to amend.  (See *Rakestraw*, *supra*, 81 Cal.App.4th at p. 44.)

## II. Anti-SLAPP appeal

### A. Applicable law and standard of review

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. (See [Code Civ. Proc.,] § 425.16, subd. (a); *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619; *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).) To that end, Code of Civil Procedure section 425.16, subdivision (b)(1) provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

An " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right

38

of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).)

The analysis of an anti-SLAPP motion involves two steps. "Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) A claim arises from protected activity "when that activity underlies or forms the basis for the claim." (*Id*. at p. 1062.) Hence, "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id*. at p. 1063.) "In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79, quoting Code Civ. Proc., § 425.16, subd. (b).)

If the defendant carries its burden to demonstrate that plaintiff's claims arise from protected activity, the plaintiff must then demonstrate its claims have at least " 'minimal merit.' " (*Wilson*, *supra*, 7 Cal.5th at p. 884.) To do so, "plaintiff must show the complaint is legally sufficient and ' " 'supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' . . . " ' " (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 488.)

An order granting or denying a special motion to strike is appealable. (Code Civ. Proc., §§ 425.16, subd. (i), 904.1,

subd. (a)(13).)  Our review is de novo.  (*Park, supra*, 2 Cal.5th at p. 1067.)

## B.    Step one

We begin our analysis at step one with determining whether plaintiffs' cause of action for defamation arose from protected activity.  (See *Park, supra*, 2 Cal.5th at p. 1061.)  " 'In the anti-SLAPP context, the critical consideration [for the defendant's initial burden] is whether the cause of action is based on the defendant's protected free speech or petitioning activity.' " (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1232 (*Tuchscher*).)

As described earlier, plaintiffs alleged that Daut engaged in defamation by making the following statements to Commission members, selection panelists, and persons in the City arts community and the press:  "(1) Mr. Govrin's organization is weak and does not have funding while 18th Street [Art Center] is strong financially, has strong management, and provides outstanding programs; (2) Informing Mr. Govrin in front of the selection panelists:  'no more money will be given to you,' suggesting that the city had given him money (which it did not), and placing Mr. Govrin in a bad light in front of the RFP decision-makers.  Ms. Daut and Mr. McKeown repeated this information to the press and in emails and private meetings with private individuals in the arts community."  Plaintiffs further alleged that McKeown "falsely claimed to the press that city officials subsidized SMAS' rent by $4 to $6 Million.  He also asked the city to audit SMAS."

The trial court agreed with defendants that their alleged defamatory statements constituted "conduct in furtherance of the exercise of the constitutional right of petition or the

40

constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e)(4).) Relying on *Tuchscher*, the trial court concluded that the award of a city contract is an issue of public interest. The trial court further concluded that defendants' alleged statements regarding plaintiffs' financial condition, funding, and subsidies all concerned the award of the airport art studios contract.

In *Tuchscher*, the plaintiff's lawsuit alleged the defendants, a city and private developers, conspired to deprive the plaintiff of the benefits of its agreement with the city to develop bayfront property. (*Tuchscher*, *supra*, 106 Cal.App.4th at pp. 1227–1228.) The court noted there appeared "to be no dispute that the proposed development . . . is a matter of public interest, and thus [the defendants'] statements and writings fall within subdivision (e)(4) of section 425.16." (*Id*. at p. 1233.) The court emphasized that the development would have "broad effects on the community"; that the city approved the agreement with plaintiff "after being publicly noticed and agendized on four separate occasions"; and that the plaintiff had conducted forums "with government agencies, local community groups, and individuals" regarding the planned project. (*Id*. at pp. 1233–1234.)

We agree with the trial court that plaintiffs' cause of action for defamation arose from protected activity under the anti-SLAPP statute. Defendants adequately demonstrated that the subject of the alleged defamatory statements—the City's contract for management of the airport art studios and SMAS's fitness to continue managing the studios—concerned a matter of public interest within the meaning of Code of Civil Procedure section 425.16, subdivision (e)(4). (See *Tuchscher*, *supra*, 106 Cal.App.4th at pp. 1233–1234; see also *Weinberg v. Feisel* (2003)

41

110 Cal.App.4th 1122, 1132 ["a matter of public interest should be something of concern to a substantial number of people"]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [" 'public interest' . . . has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity"].)

Defendants submitted McKeown's declaration, which established that the City's operation and management of the airport are matters that frequently came before the City Council and "have always generated intense interest from the general public"; that airport issues considered by the City Council in open session typically "enjoy[ed] a robust and well-attended public hearing"; and that neighborhood groups had for decades petitioned City Council members to expand non-aviation uses of the airport, including its art facilities. As explained by Daut's declaration, the airport is "home to the largest concentration of artists working in the City," and there is a "long and rich tradition of artists working at the Airport" dating back to the 1950's.

The allegations in plaintiffs' first amended complaint also supported the City's contention that management of the airport art studios was a matter of public interest. For example, the complaint alleged that when the City Council held its meeting to consider award of the art studios contract, it heard from "dozens of artists who appeared at the hearing to support" Maxima's bid proposal. The complaint further alleged that "[t]wo thousand five hundred members of the community signed and submitted a petition to the City Council" in favor of SMAS, and that 31 of the

42

35 artists with studios at the airport signed a petition requesting the City to retain SMAS as a manager of the airport art studios.

On appeal, plaintiffs do not appear to dispute that the City's contract for management of the airport art studios and SMAS's fitness to continue managing the studios were matters of public interest within the meaning of the anti-SLAPP statute.[19] Rather, they contend defendants are not entitled to protection under the anti-SLAPP statute because "the defamation cause of action is not based on any right of free speech or petitioning activity," but instead defendants' allegedly defamatory statements. They argue that the "defamatory statements of [defendants], although related to an issue of a public interest nature (a city contract) veered far beyond being an issue of interest to the public into purely defamatory language against plaintiffs." Plaintiffs further maintain that McKeown and Daut made the purportedly defamatory statements in order to "destroy Appellant Govrin's character and good name during the RFP process" and ensure that "their preferred contractor won the contract." Finally, plaintiffs urge that, while "management of the airport studios may have been a topic of some public interest," the denigration of Govrin and his business was not.

We are not persuaded by plaintiffs' arguments, which appear to rest on the mistaken view that defendants cannot meet

_____

[19]    In fact, in their opposition to the anti-SLAPP motion in the trial court, plaintiffs noted that McKeown's statement to the press "involved a matter of public concern," that "the management of the airport studios may have been a topic of some public interest" and that McKeown's "conduct and speech may have some elements of protection, to the extent that he was speaking about a public contract."

43

their burden at step one of the anti-SLAPP analysis because the challenged statements were defamatory. A similar argument was rejected more than two decades ago in *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294. There, the court explained: "Fox argues its suit does not fall within the SLAPP statute because Paladino has no First Amendment right to disclose privileged and confidential documents or to refuse to return those documents to Fox, their rightful owner. The same argument could be made by the plaintiff in a defamation suit— the defendant has no First Amendment right to engage in libel or slander. Yet, defamation suits are a prime target of SLAPP motions. [¶] The problem with Fox's argument is that it confuses the threshold question of whether the SLAPP statute applies with the question whether Fox has established a probability of success on the merits. The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the inquiry as to whether the plaintiff has established a probability of success would be superfluous." (*Id*. at p. 305, fns. omitted; see also *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464 [rejecting trial court's conclusion that defamatory statements can never be protected activity under anti-SLAPP statute].)

Nor do we agree, as plaintiffs contend, that this case involves a so-called " 'mixed cause of action' that combines allegations of activity protected by the [anti-SLAPP] statute with allegations of unprotected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381.) Plaintiffs appear to argue the cause of action is "mixed" because, although management of the airport art

44

studios was a matter of public interest, defaming Govrin and his business was not. This does not describe a "mixed cause of action" under *Baral*. The argument instead appears to rest on the same mistaken premise described above, i.e., that defendants cannot meet their burden at step one of the anti-SLAPP analysis because, even if the alleged statements of McKeown and Daut concerned a matter of public interest, the statements lost their protection because they were defamatory. We reject this argument for the reasons described above. (See *Hecimovich v. Encinal School Parent Teacher Organization*, *supra*, 203 Cal.App.4th at p. 464; *Fox Searchlight Pictures, Inc. v. Paladino*, *supra*, 89 Cal.App.4th at p. 305)

Last, whether McKeown and Daut made the challenged statements to cause Govrin harm or favor 18th Street Art Center, as plaintiffs allege, is not relevant at step one of the anti-SLAPP analysis. (See *Wilson*, *supra*, 7 Cal.5th at p. 888 ["at the first step of the anti-SLAPP analysis, we routinely have examined the conduct of defendants without relying on whatever improper motive the plaintiff alleged"]; *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1038 ["our task at the first stage of the anti-SLAPP analysis is to examine the challenged conduct without regard to the allegations of improper motive"].)

In sum, we conclude that defendants met their burden of demonstrating that plaintiffs' defamation cause of action arose from protected activity. (*Park*, *supra*, 2 Cal.5th at p. 1061.)

## C.     Step two

At step two of the anti-SLAPP analysis, we examine whether the plaintiffs have demonstrated their claims have at least " 'minimal merit.' " (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

45

We conclude that plaintiffs fail to demonstrate their defamation cause of action has at least minimal merit. First, apart from their failure to comply with the Government Claims Act, plaintiffs failed to file their complaint within one year of the accrual of their cause of action for defamation. (See Code Civ. Proc., § 340, subd. (c).) Plaintiffs' cause of action accrued when McKeown and Daut made the allegedly defamatory statements. (See *Shivley v. Bozanich* (2003) 31 Cal.4th 1230, 1247 [cause of action for defamation accrues "at the time the defamatory statement is 'published' "].) Although the first amended complaint does not identify the date of the challenged statements, plaintiffs do not dispute the trial court's determination that the statements occurred no later than December 18, 2018, the date the City awarded the airport art studios contract. Because plaintiffs filed their complaint on November 17, 2020, more than a year later, their defamation cause of action was barred by the applicable one-year statute of limitations.

Second, even if the one-year statute of limitations did not apply here because a separate statute of limitations applies in cases subject to the Government Claims Act (see § 945.6 [providing statutes of limitations for suits "against a public entity on a cause of action for which a claim is required to be presented"]; *County of Los Angeles v. Superior Court* (2005) 127 Cal.App.4th 1263, 1267–1268), plaintiffs' cause of action still fails because they did not present a timely claim in accordance with the Government Claims Act (see *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 454 ["Compliance with the claims statutes is mandatory [citation] and failure to file a claim is fatal to the cause of action."]; *Olson*, *supra*, 17 Cal.App.5th at

46

pp. 1060–1064 [affirming dismissal of defamation cause of action for failure to comply with claim presentation requirements]).

On appeal, plaintiffs' argument regarding step two of the anti-SLAPP analysis, in total, is that their defamation cause of action was not time-barred "because the provisions of the [Government Claims Act] were not satisfied and the principles of equitable tolling apply" to their first amended complaint. We have rejected both arguments already.

In sum, plaintiffs fail to demonstrate their defamation cause of action has minimal merit. The trial court thus correctly granted defendants' anti-SLAPP motion.

## DISPOSITION

The trial court's judgment is affirmed. The trial court's ruling sustaining defendants' demurrer without leave to amend and its order granting defendants' special motion to strike pursuant to Code of Civil Procedure section 425.16 are affirmed. Plaintiffs' motions to augment the record are granted. Defendants shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.